This next case is 4-14-0599, in re Marriage of Robert Blumthal and Deborah Blumthal. Appearing for Appellant is Luke Thomas and for Appellee is Christopher Shearer. Mr. Thomas, are you ready to proceed? May it please the Court, Opposing Counsel. I believe we have two issues, or at least two main issues on appeal in this case. The first issue is going to be maintenance and specifically the amount duration in terms of review of that maintenance that was ordered by the trial court. The second issue on appeal is going to be the trial court's determination that Mr. Blumthal did not in fact dissipate the marital estate. There are two standards of review in this case. The first on the proprietary of a maintenance award is that we are looking at an abuse of discretion standard. The determination of whether or not dissipation occurred is a manifest weight of the evidence. As to the maintenance issue, the trial court ultimately awarded the appellant $1,200 per month for a period of 26 months. The trial court ordered that to be reviewable and stated that at the time that it was to be reviewed, the appellant would have the burden to establish whether a continued maintenance award was appropriate and whether or in fact the amount of the maintenance award she had to establish that as well. We believe that this finding was the first instance of reversible error on part of the trial court. In making a maintenance award, the court has really three options in determining what type of maintenance to award. First, they could decide to make an award of rehabilitative maintenance for a specific duration and that's appropriate when the court can determine that the person receiving maintenance has the ability to earn income to allow him or her to enjoy the standard established during the course of the marriage. The court can also make a permanent award of maintenance not subject to review and lastly, can make an award of permanent maintenance subject to review of proper petition and a showing of a substantial change of circumstance. In this case, it's not particularly clear on what type of award was made, but it seems to be that it was more of a rehabilitative maintenance award than the other two. In this case, in fact, we believe that there was no showing that a rehabilitative maintenance award was appropriate. In fact, the trial court in concluding that it was not convinced that the appellant's health conditions were going to prevent her from earning a substantial income in the future, we believe that was the incorrect standard to apply. The court did not look at the standard enjoyed by the parties during the term of their marriage. We believe that was an incorrect standard by which to determine the maintenance award. Also, that statement that she was not going to be limited from earning substantial income wasn't supported by the record. In fact, we failed to see any facts cited in the record that supports that. The income that... But counsel, regarding her income, we learned from the briefs that she was involuntarily terminated from her job, so she wasn't terminated based on health considerations, correct? That is correct. So isn't it reasonable for the trial court to determine that she can work since she had been working and then she had the one day a week that she was doing the counseling, correct? That would be correct. But for the circumstances that arose after her involuntary termination, I believe the record would support a showing of health conditions that either arose or had worsened from that time period, including her fibromyalgia. She had cervical and disc degeneration disease, suffered from migraines. And we have the dispute regarding that as well as far as her medical records, whether or not the trial court could consider the records, whether or not they were actually admitted or not admitted. I know there was a supplemental motion. Can we get a definitive answer on that? I mean, was it admitted? From my review of the record, I can't see where the trial court specifically made a ruling that that supplemental record was admissible. It appears that the court did at least consider the matters that were raised in there. But even so, the only evidence before the trial court then would have been Ms. Blumenthal's testimony about those conditions. So the trial court did at least have her testimony, even if it did not consider or it was improper for it to consider the physician's statement that was submitted. They did have her testimony before it. And that was uncontroverted. In fact, Dr. Blumenthal testified he wasn't even aware that Ms. Blumenthal suffered from fibromyalgia. So he didn't provide any evidence to the contrary. In fact, provide a little insight as to what his understanding was as far as her limitations. So we believe even if the trial court did not consider or if it was improper for it to consider the physician's statement, her testimony established that. And the fact that she was working on a very limited basis during that same time period also substantiates that her health conditions were, in fact, limiting her ability to work. Was the trial court required to believe her testimony in that regard? No, but the trial court didn't specifically discredit that testimony either. In fact, it didn't say whether it did not believe her or that those conditions. It simply said that, and in part, it tied her ability to earn substantial income to her teacher's retirement system income of $36,000 per year. So that looks to appear that it felt that based on that income, she could earn substantial income. But there was no other evidence shown as to what her income potential was to be or what she could have earned. And I think considering her dismissal was involuntary, and her testimony about her health conditions, and during that time period of the limited income she earned, and if the court considered the physician's statement that it was established that her ability to earn income as compared to what was earned during the course of the marriage and the standard established during the marriage had surely decreased since that 2009 dismissal. On the other hand, we had Dr. Blumenthal who had earned a substantial income during the course of the party's marriage and through the date of trial was earning a little over $140,000 per year. That compared to the $36,000 that was established as the TRS income for Ms. Blumenthal. Mr. Thomas, I'm going to switch gears here and go to the dissipation argument. In your brief, you indicated that in regards to Ms. Witte, there were letters apparently authored by Mr. Blumenthal terminating the relationship. Are there letters in the record suggesting this, or was this testimony from one of the parties indicating that? As I recall, I believe that was testimony established at trial. I don't recall specifically seeing those, and I believe they were referenced as emails. I don't recall seeing those emails at record. Okay, and do you know, was this your client that testified to that? It wasn't Mr. Blumenthal admitting to having written those letters, is that correct? I'm not certain as I stand here who established that. I believe that was testimony from my client that did establish that. As I recall, in addition to Ms. Witte, I do believe there was admission by Mr. Blumenthal to the relationship with the subsequent friend that they had as far as what we classified as an extramarital affair. I do believe that Mr. Blumenthal did admit during that same time period as Ms. Witte that he did in fact contact his attorney to change his last will and testament to provide that she in fact was going to be the beneficiary of his estate upon his death. I believe that he subsequently testified or established that that change never took effect, in part due to the ongoing marriage counseling and the ultimatum given by my client as to what the consequences would be ultimately divorced if he continued with that relationship. So your client conceded having an affair with both of the women that were mentioned? No, my client did not. We believe the record established that. I'm sorry, yes, Mr. Blumenthal. Blumenthal established on the second relationship. Okay, just the second. Yes, I believe he maintained throughout the proceeding that there was no affair or extramarital relationship with Ms. Witte. Okay. And your opponent indicates in the reply brief that even if there is proof of dissipation, the trial court isn't required to charge the dissipating party with that amount. It's permissive. The court may do that. So in this case, how is it an abuse of discretion for the court not to do that when there was evidence of dissipation by your client? Well, I believe that the facts were, and it was pretty much, I believe, overwhelming as far as the dissipation and the expenditures that were being made during the time period that the marriage was obviously broken down. In fact, as I recall, there was an IRA during the same time period that either parties were undergoing counseling or during the same time period where it was alleged that Mr. Blumenthal was having an affair with Ms. Witte, that he in fact liquidated his IRA in the amount of $50,000 and could not, upon examination, state specifically what those monies were used for. I think he may have testified that he used it for bills and credit card bills, but there was no evidence to the contrary or no evidence rather establishing what those monies were used for. Was that done before or after the separation? I believe that was done after the separation. Same way with the expenditures for Ms. Witte after the parties had decided it was time for counseling and then following that, when he reengaged his relationship with her, there was gifts, and I believe the record did have in fact two $1,000 checks made payable to her, which Dr. Blumenthal stated were to assist her with purchasing Christmas gifts for her children. Then we also had, at the time the parties were clearly separated, an all-expense paid trip to Florida, which Mr. Blumenthal rented a separate hotel room for Ms. Witte and her friend, paid for a convertible for them to use during that same time period. I believe that that evidence, that and what we've talked about, and all of the information before the court was an accumulative effect, would leave no reasonable person to conclude otherwise, that these expenditures were not in fact for extramarital purposes and certainly not for the benefit of the marital estate, especially when they're separated, have went through counseling which failed, and then we've got these types of expenditures all the while these trips are being made and pretty extravagant trips at that. Then also Dr. Blumenthal admitting after Ms. Witte that he was taking all-expense trips to Philadelphia. I mean, they travel by limousine. I just don't see how this is tied to how that would benefit the marital estate. It certainly wasn't with the permission of Ms. Blumenthal. So I think that the trial court had to simply ignore that and perhaps, as the court indicated, may have become frustrated with Ms. Blumenthal's actions and the actions that she took when she allegedly discovered this, caused him to have to rent a vehicle and so forth, and the court may have very well properly found that those actions did lead to dissipation in an amount of about $4,300. At least as to the Florida trip, I think Dr. Blumenthal testified that this travel for the two women was done as a reward for their good work with helping him in the nursing home practice. Was there evidence of that sort? He did testify that that was the reason, and I think that was as referenced in our brief, that was at the same time period where they were undergoing examination by the Internal Revenue Service for failing to pay income taxes, and I believe on cross-examination, rather, he testified he provided those trips because they were having a good year financially, that those trips were requested by Ms. Witte and her friend to take them there and provide the lodging and the vehicle and so forth. If they're found to be a business expense, and it's his business from which the marital estate receives income, then it would benefit the marital estate, too. I think you would have to establish that through some form or another showing that there was ongoing employment, that that would be some sort of practice to award these employees, because he testified that their employment was of a very limited nature at that juncture when these trips were being provided. So certainly he could contend that that was related to business, but I don't, again, believe that the prior fact that recently concluded that that's true or accurate based on the evidence before the board. Certainly considering the substantial debt owed to the Internal Revenue Service, and you have that kind of tax debt, how you could classify it as a good year business-wise and then in turn pay for these employees while ignoring the debts that were, in fact, determined, at least from the Internal Revenue Service, to be marital obligations. So those expenditures would not be in the best interest or beneficial to the marital estate. Also in regard to the maintenance award and I guess the proprietary of it, the trial court seemed to focus on the Internal Revenue Service debt as having some sort of impediment on Mr. Blumenthal's ability to pay in the future. I believe that the trial court had the Internal Revenue Service taking affirmative action to collect that and could show that that was being deducted from Mr. Blumenthal's ability to pay. That may have been proper to consider, but in this case it was purely speculative at best that the IRS was going to even pursue the debt for one, but to pursue it to the extent that Mr. Blumenthal was going to have to pay it and not Ms. Blumenthal. Could you expand on that a little bit? You seem to downplay the IRS debt. I mean, there's no disagreement between the parties that there is that IRS debt. Is that right? There's no disagreement for the purpose of the trial that took place, but I believe throughout the trial, I mean, Dr. Blumenthal tried to establish that that debt really wasn't owed, but for these records he couldn't get his hands on it. I believe the record also establishes he engaged representation, in fact the tax attorney representing him in contesting these amounts. Okay, so from what I gather, just based on the tenor of the brief, your beef is with the trial court agreeing that the IRS was actively collecting or actively going to collect on that past due amount. That would be correct. That would be the issue we see is the trial court could have made a permanent award of maintenance and then that would be proper if the IRS was actually taking action to collect the debt or if it was subsequently determined that Mr. Blumenthal was not going to be able to obtain the relief from the tax court that he said he was pursuing, then he could certainly file a petition stating that they've levied against his wages, his bank accounts, his assets, something that would show that he has a present inability to pay the proper maintenance award and he could file a petition alleging that and I believe that would meet the standard of a substantial change in circumstances that wouldn't cause the trial court to speculate what's going to take place into the future. Also, I mean, that's very similar to the argument in why the court set up the review in 26 months stating that it believed that Dr. Blumenthal was going to retire at that time. My review of the record showed that there was really no evidence other than perhaps counsel's close and written argument that Dr. Blumenthal was even going to in fact retire at that time period. So that too we believe was speculative on the trial court's part to state that and use that as a basis to set the maintenance for review and also with the review of the maintenance then to shift the burden to Ms. Blumenthal. We believe that's an improper burden shifting in that regard too because in fact if anything, the record established that Dr. Blumenthal was going to receive half of Ms. Blumenthal's TRS payments which would only increase his income. That was established by court order and that could be determined definitively at the time the court made its award. Whether Mr. Blumenthal was going to retire, again, there's nothing that would require him and there's no evidence presented that was going to require him to retire and have a decrease in income and a decreased ability to pay maintenance. So I guess basically what we're asking the court is to reverse the trial court and ask the trial court to apply the proper standard and that's going to be the standard that was enjoyed during the party's marriage and the standard established. Taxes that are not, even during that same time period, the party's owned a substantial home, took substantial trips, which Mr. Blumenthal continued to do throughout the proceedings. Whether they were business expenses or not, he had the ability to take those and there's no showing not having filed his taxes that those were business expenses that he was able to deduct or not. Mr. Thomas, you're out of time. You'll have time on reply. Thank you. Thank you. Mr. Scheer? Mr. Scheer, just picking up on something Mr. Thomas said towards the end of his remarks, is it speculative that the IRS is pursuing or will pursue a retirement plan for Mr. Blumenthal? On this tax debt owed and was there anything in the court's order that ordered Dr. Blumenthal to pay that tax debt and to hold Mrs. Blumenthal harmless? I believe the court's judgment allocated the IRS tax liability equally as well as the potential Illinois Department of Revenue liability. That would be on page 5 of the trial court's judgment, indicating in the spreadsheet that each party was allocated a negative $80,842 for the 2003, 2004, 2005, 2007, 2008, 2009 IRS tax deficiency. There was some testimony from Dr. Blumenthal regarding the tax liability and the court outlined its findings in paragraph 10 of the judgment. And there was also a motion to supplement the record that Mr. Scott filed post-hearing that the court allowed regarding additional information regarding the IRS tax liability. There were levy notices or notices of, sorry I don't have the proper term on the tip of my tongue, but the record was supplemented post-hearing regarding some of those IRS issues. With respect to the issue of dissipation, the trial transcript in this case consists of about 150 pages and there were roughly 43, 44, 45 trial exhibits admitted during the hearing, all but one of which were presented by Dr. Blumenthal and Mrs. Blumenthal, her only exhibit was her financial affidavit. In the 150 pages of transcript you will see that there was a lot of discussion regarding, a lot of conflicting testimony regarding who had what records, what records were available to whom. Dr. Blumenthal testified that there were a significant amount of financial records and business records that were unavailable to him due to the actions of Mrs. Blumenthal. Mrs. Blumenthal denied that and the trial court appears to have made a credibility determination on that issue because the interesting part of the dissipation argument is they're claiming dissipation based on transactions and things that occurred for which Dr. Blumenthal did not respond because he did not have records to discuss. In the transcript in particular there was a question regarding what he did with a particular, when he cashed in an individual retirement account, his response was, well I think I paid this off but I don't know, it was in my record that I don't have. So that is the factual mess that the trial court was presented with in trying to deal with these issues of dissipation that both sides were levying against each other. And frankly I think the trial court did the best that it could with what it had. Mrs. Blumenthal, her attorney was asking questions regarding specific accounts ending with various numbers and how things were funded and just reading through the transcript it's not easy to follow what she was referring to and it took me a while in preparing for today to try to connect all these dots that Mrs. Blumenthal's attorney was apparently trying to connect for the trial court. At the end of the day, of course a dissipation claim is a very fact intensive issue that requires a determination regarding credibility of witnesses and I believe that's exactly what happened here. The trial court considered all the arguments, carefully considered all the arguments that were being made by everyone and on a one-on-one individual basis as to each claim determined that there were only two actual instances of dissipation by the parties and those were charged to Mrs. Blumenthal. In their opening brief, in Mrs. Blumenthal's opening brief, she cited to the Murphy case which was decided by this court in 1994, Justice Knack wrote the opinion. The court affirmed that there was no dissipation in that case and in that case, there as here, there was complaints made about vacation with girlfriends and money being spent on paramours and gifts, etc. In that case, it was based on the husband's own testimony. This court found that there was no abuse of discretion in failing to find that there was any dissipation of assets or that it required a major charge against the husband's share of marital property. Based on the record as a whole, there were a lot of, for example, implications of dissipation based on buying flowers for a co-worker's funeral, gifts for a grandchild, that sort of thing. So the trial court was called upon to sift through all these very specific arguments and arrive at a conclusion and it's our position that the trial court either believed that the funds were used for legitimate purposes or consciously found that Dr. Blumenthal's testimony was credible while giving Mrs. Blumenthal's arguments little weight. Even if the court had found that dissipation occurred, as Justice Harris noted earlier, the trial court was not required to charge any dissipation against Dr. Blumenthal, but he was free to do so. And based on the record as a whole, we don't believe that the trial court's decision regarding Mrs. Blumenthal's dissipation arguments is against the manifest way of the evidence. With respect to the maintenance award, again, the record, there are certain things in the record, but most significantly missing from the record was testimony from a doctor regarding her physical condition. Mrs. Blumenthal was asked on examination by Mr. Scott about her physical or medical conditions. She was reluctant to discuss that. She was evasive when mentioning them. It was not until later when Ms. Williams was questioning her that she came out and talked about her fibromyalgia, her degenerative disc condition, her migraines, etc. And then later, post-trial, they wanted to submit a letter that was not on letterhead. Mr. Scott objected to it. They provided a letter on letterhead discussing her various conditions. And the record does not disclose that the trial court ever made a ruling on the admissibility or whether it was going to consider that evidence. But at the end of the day, I think that the trial court's mention in paragraph 17 that the court is not convinced that Deborah's inability to work full-time equates to an inability to earn substantial income, I think that can be read to bear on the trial court's credibility decisions regarding the evidence about her ability to work or her ability to not work. Again, Mrs. Blumenthal was separated from employment just prior to the divorce proceedings. The 150 pages of transcripts details the different, shall we say, games Mr. Scott in one of his briefs called it dirty divorce tricks, things that happened during the course of the divorce proceedings. And even though the trial court did not indicate any kind of disbelief or did not suggest that her lack of employment or her working one day a week was of her own conscious choice and she actually had the ability to work more, although the trial court did not expressly come out and say that, I think that by reading that one sentence that the court's not convinced that her inability to work full-time equates to an inability to earn substantial income, to me that suggests that the trial court's implying that maybe she can work more and that he wasn't persuaded, the trial court was not persuaded, based on the evidence before it, that one day a week was all that she could work. Again, that's reading between the lines on my part, I wasn't at the trial court, I was not there to hear the witnesses and listen to the testimony, Judge Otwell was, and based on the two days of testimony, this is what he came up with. He chose to award Mrs. Blumenthal $1,200 per month and then to come back later in about two, two and a half years to re-evaluate the situation and determine whether maintenance should be extended beyond that. I cited in my brief the proposition that rehabilitative maintenance for a period followed by review is reasonable and something that the courts of Illinois have recognized is appropriate and that's exactly what the court did here. The court here was satisfied, or excuse me, was tasked with the responsibility to determine Deborah's future earning capacity. Dr. Blumenthal's ability to pay maintenance and to resolve the credibility issues based on conflicting evidence. Mrs. Blumenthal, her testimony was uncontroverted, as counsel indicated. Dr. Blumenthal was not aware of some of her conditions prior to hearing about them at trial. Based on that, we believe that the trial court acted within its discretion to establish maintenance at $1,200 per month and to make it reviewable after a time certain. At page 10 of your brief, you indicate that when combined with her retirement benefits, Mrs. Blumenthal will receive $4,301 per month while Dr. Blumenthal is left with approximately $6,035 per month with which to meet his reasonable needs and to pay down the significant debt that the trial court allocated to him. Are those figures net figures? Yes, those are. Dr. Blumenthal is a net figure. Mrs. Blumenthal, I don't believe that's a net figure that I used because I acknowledge maintenance would be taxable to her. I have not run that calculation as to what it would be net for her. However, looking at how the trial court allocated the debt, on page 5 of the judgment, Dr. Blumenthal was almost $163,000 while Mrs. Blumenthal was almost a negative $34,000. So clearly, Dr. Blumenthal received a grossly disproportionate amount of debt in the trial court's judgment. Thank you. Again, we believe that the trial court acted within its discretion on the maintenance issue. It's reasonable, it's fair, and it's logical based on the way the trial court set it up. We do not believe that his findings on dissipation is against the manifest way of the evidence. I'd be happy to answer any other questions the court might have.  Mr. Thomas? Thank you. Touching back on the dissipation issue, counsel's remarks about the records, I don't believe the trial court made an explicit finding on who it believed. I don't think the record reveals that it found that Ms. Blumenthal destroyed any records or that Mr. Blumenthal destroyed any records. And it seems to be that if, in fact, the trial court were reading between the lines and thought that Ms. Blumenthal destroyed records and that we would have to have a specific factual finding as to which records were destroyed, it seems to be that that's something that would have been better addressed at a discovery sanctions hearing and determine what specific records Dr. Blumenthal thought supported his expenditure of $50,000 in regard to any sort of discovery violation or failure to produce those records if they were, in fact, in her possession. And it's certainly a very hefty penalty for not providing records to the extent that $50,000 was at issue. Back to the IRS debt. The only matter of record showing any action taken by the IRS to collect that debt again was a notice of intent to levy against Dr. Blumenthal's wages. In fact, they suspended those proceedings. The only amounts actually levied, I believe, were approximately $1,200 levied against his wages at one time. At the time of trial, all collection activity had been suspended. I don't believe the record is clear as to why the IRS suspended those proceedings. But again, had the IRS, again, been actively pursuing or there was some sort of evidence showing that it was aggressively pursuing that, that's one thing. But in this case, we have no collection activity being taken. It certainly would have provided for a change of circumstances in the future. Even if the trial court completely disregarded Ms. Blumenthal's testimony about her medical condition, whether because she was hesitant on cross-examination by opposing counsel to openly discuss her medical conditions or because it didn't find that her medical conditions were established competently on direct examination by her own attorney, we're still faced with a huge disparity in income. The court found that Ms. Blumenthal's substantial earning capacity meant that she could earn the income that she earned before she was involuntarily discharged in 2009. We're still looking at income at $60,000 on her part and $144,000 on Dr. Blumenthal's part. Certainly on a 30-year marriage, a little over $12,000 a year, or her rough leg is rather $14,000 a year in total taxable maintenance to her, certainly doesn't reach an equitable award of maintenance. What was the status of his, I believe it was the nursing home income that he had? What was the status of that at the time the trial court made its determination? Because I know there was some suggestion that that income had been impacted by the client's activities. I believe Dr. Blumenthal testified hesitantly that he was able to restart that practice. Didn't he indicate that he had lost the biggest account, so to speak, and had not recovered that? I believe that was his initial position on direct examination. I think ultimately, though, he did admit that that practice was back going, and the trial court specifically found that his excuse that Ms. Blumenthal didn't provide him with whatever notice was an excuse on his part because he's the licensed professional and knows what he needs to do to maintain that, so to use that as a basis. Subsequently, Ms. Blumenthal's actions somehow prohibited him from maintaining that practice. I think the trial court found that to be disingenuous on his part. Again, my calculation, just roughly sitting here, even after his maintenance not taking into tax considerations, he was still left with approximately $130,000 a year gross, and if the trial court completely discredited any of the ability to earn income, I mean, Ms. Blumenthal would have had a gross of $74,000. Again, the award of maintenance was certainly improper, in fact, to the form of the maintenance that was rehabilitative. Certainly, the burden now, I don't believe the trial court would be proper in shifting that burden to her. Thank you. All right. Thank you, counsel. This case will be taken under advisement and a written decision shall issue.